# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 C 7376 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| PIPEFITTERS ASSOCIATION | ) | |
| LOCAL UNION 597, U.A., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Anthony Moore is an African-American member of Pipefitters Association Local Union 597 ("Local 597"). While his battle with his Union goes back a decade when he first filed charges with the EEOC, his Complaint in this case charges Local 597 with race discrimination, retaliation, and failure to represent him. Mr. Moore claims Local 597 failed to recall and/or refer him for jobs, first through its hiring hall and later through its referral hall, because of his race and/or because he has filed claims against Local 597, and has spoken out against it. According to Mr. Moore, Local 597 referred non-African-American members who were lower on Local 597's out-of-work list than he. Mr. Moore also blames Local 597 for the fact that no signatory contractor has hired him directly. He brings his claims under 42 U.S.C. §1981 and Title VII, 42 U.S.C. §§2000e-2; 2000e(3).

On February 14th, defendant filed its motion for summary judgment. [Dkt. ##171-173]. Defendant also filed its motion to bar plaintiff's expert. [Dkt. ##168-170]. That motion was noticed for February 20, 2014. [Dkt. #170]. Mr. Moore failed to appear or call on February 20th. Although his response to the motion for summary judgment was to be filed by March 18th [Dkt. #163], because

the plaintiff was *pro se* I *sua sponte* granted him an extension to April 24, 2014 to respond to the summary judgment motion, as well as the motion to bar. [Dkt. #175].

On March 17, 2014, Mr. Moore filed a motion "for temporary withdrawal due to medical issues." [Dkt. #176]. The motion, which sought a six month delay, claimed that Mr. Moore had been prescribed certain drugs for his knee having "go[ne] out" whose "psychotropic side effects" prevented him from being able to respond to the motion. With the motion, Plaintiff attached nine pages of medical records. [Dkt. No. #176]. I concluded that that motion did not warrant the relief requested. *See* Order of 3/28/14. [Dkt. #177]. Nonetheless, as will be seen below, Mr. Moore effectively received multiple, informal extensions to file his brief.

Yet, as of the date of this Memorandum Opinion, Mr. Moore still has not filed any response even though he has, in effect, had four months to respond. Additionally, despite repeated requests, he has refused to give a date when one might expect his response. In fact, on May 29th, all Mr. Moore could say is that his doctor had told him that he could do no gardening. But he refused to give any estimate no matter how far off in the future of when he would respond to the motion for summary judgment. [Dkt. #205].[1]

Not surprisingly, the Union has now moved for a ruling on the motion for summary judgment and its motion to strike the plaintiff's expert's report. [Dkt. #206].

The indisputable facts surrounding this case compel the conclusion that Mr. Moore is attempting to absolve himself of his obligation to pursue his own case and to abide by reasonable deadlines. He is seeking to forestall judgment in the case and leave the Union dangling while he pull

---

[1] The minute order noted that, as in every prior status conference with Mr. Moore, he was lucid, vigorous, forceful, unyielding in his positions, energetic and totally engaged. But he refused to commit himself to when he would respond to the motion for summary judgment. [Dkt. #205].

the strings of all the participants. Mr. Moore's *pro se* status does not entitle him to the kind of singular and special treatment that he unfairly seeks to accord himself. *See McNeil v. United States,* 508 U.S. 106, 113 (1993); *Ammons-Lewis v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 543 Fed.Appx. 591, 594 -595 (7th Cir.2013); *3SM Realty & Development, Inc. v. FDIC*, 393 Fed.Appx. 381, 383 (7th 2010); *In re Gunartt,* 355 Fed.Appx. 66, 68 (7th Cir. 2009); *McKinney v. Guthrie,* 309 Fed.Appx. 586, 590 (3rd Cir. 2009); *Mathis v. New York Life Ins. Co.,* 133 F.3d 546, 548 (7th Cir.1998).

Because of Mr. Moore's conduct, it is necessary to review in some detail the ostensible reasons for Mr. Moore's continuing failure to respond to the motion for summary judgment.

# I.

## FACTUAL BACKGROUND

Overall, Mr. Moore has been a rather reluctant participant in his own case, both before and after firing his second set of attorneys in October 2013, and proceeding *pro se*. [Dkt. # 161-163]. Mr. Moore began his case, *pro se*, and by August 11, 2011 he had failed to appear for status hearings three times without excuse. Judge Holderman, then presiding over this matter, ordered him to appear at the next hearing or his case would be dismissed for want of prosecution. [Dkt. #39]. Mr. Moore retained counsel and was represented at that hearing. [Dkt. ##40-43]. In December 2011, the case was referred here for discovery supervision and a settlement conference. [Dkt. ##45-46].

In February 2012, Mr. Moore's counsel moved to withdraw. The motion was denied based upon representations made in open court. [Dkt. #54]. But by May 2012, notwithstanding whatever representations had been made, Mr. Moore's counsel again moved to withdraw. That motion was granted. [Dkt. #76, Dkt. #83].

By May 2012, Mr. Moore was again ignoring dates for hearings before Judge Holderman and this court, missing hearings on May 31st, June 12th, and June 26, 2012, without calling or providing any excuse. [Dkt. ##84, 91, 97]. As before, he was warned that his consistent failure to participate in his case could result in the dismissal of his suit. [Dkt. #97].[2]

On September 13, 2012, I held a settlement conference, and the parties reported the case was not settleable. [Dkt. #109]. A month later, new counsel for Mr. Moore filed their appearances. [Dkt. ##113-118]. In May 2013, there were proceedings to determine whether a second settlement conference would be productive. In light of the plaintiff's having doubled his demand from the time of the earlier unsuccessful settlement conference, it was agreed that another conference would be pointless. [Dkt. ##144-145].

In late July 2013, the parties consented to jurisdiction in this court pursuant to 28 U.S.C. §636(c). [Dkt. ## 156-158]. Mr. Moore was represented by new counsel at this time.

In early October 2013, less than a year after they filed the Fourth Amended Complaint [Dkt. #122], the plaintiff's five new lawyers filed their motion to withdraw, having been discharged by Mr. Moore. [Dkt. ##159-162]. That motion was granted. [Dkt #162].

In November, Mr. Moore informed the court that he would be proceeding *pro se* [Dkt. #163] dnd he began to again miss court hearings. For example, he sent an email on January 14, 2014 to my courtroom deputy saying he would not be in attendance at the hearing on January 16th, because he might be needing some sort of surgery. [Dkt. #164]. The date was changed to the 17th to accommodate Mr. Moore.

---

[2] Mr. Moore, following the departure of his lawyers, was responding to various motions of the defendants, including a motion to dismiss his third amended complaint. [Dkt. #100 (7/10/12)]. *See also* Dkt. ## 132, 134.

On January 17th, Mr. Moore called my courtroom deputy saying he wouldn't be appearing because he was taking some unspecified medicine and that he thought he was going to require surgery at the VA but would give no specifics. When counsel for defendant appeared, we tried to reach Mr. Moore. Even though it was 8:40 a.m., there was no answer at his house phone. The hearing was continued to January 21st and Mr. Moore was ordered to attend. [Dkt. #165].

On January 21st Mr. Moore again failed to appear or call as he had been ordered to do. Consequently, we were forced to contact him by phone. Mr. Moore claimed he was unable to come to court and that he was taking psychotropic medication in connection with his having thrown out his back shoveling snow. He said the drugs caused his speech to be slurred, but as I observed in at least two minute orders, several months apart, his speech was lucid, clear, forceful, unimpaired and did not differ in the slightest from his speech that I had observed in the several times he appeared before me and during a settlement conference in 2012. [Dkt. ## 109, 166, 192].

I explained that Mr. Moore's unsupported representations could not suffice to postpone the progress of the case and that he needed to substantiate those representations. In this conversation, Mr. Moore said he would not appear at a continued status the next day, and I said that we would contact him by phone. He was ordered to submit medical support for his position that he was unable to come to court or to file a response to the defendant's motion for summary judgment that was currently due on March 18th – the defendant's motion having been filed on February 14, 2014. [Dkt. # 163]. The case was continued to January 22nd. [Dkt. #166].

On January 22nd, we contacted Mr. Moore by phone, and he represented that he would abide by the briefing schedule which had been in place for some time. Yet, he refused to appear at yet another rescheduled hearing the next day. He was ordered to produce medical evidence to support

his claims that he could neither come to court nor call in to participate in his lawsuit. Both the court and Local 597 mailed Mr. Moore copies of Local Rule 56.1, governing summary judgment motions and responses, and an explanation of the consequences of failure to comply with that rule. [Dkt. #167].

Interestingly, on February 4, 2014, Mr. Moore was seen walking the picket line at the Local 597 Union hall on Ogden Avenue in Chicago. He did not require the use of a cane or other device. [Dkt. ## 183,187].[3]

At the next status hearing on February 20th, Mr. Moore didn't show up and didn't bother to call in to participate or explain his absence. [Dkt. #175]. The minute order of February 20th cautioned Mr. Moore that if he continued to shirk his obligations, his case could be dismissed with prejudice for want of prosecution and/or failure to comply with court orders. [Dkt. #175].

On March 17th, Mr. Moore filed a typed motion to temporarily "withdraw from his case" for six months due to claimed medical issues with his back and knee. [Dkt. #176]. He claimed he would be having two surgeries – apparently on his back and knee. Later, on February 25th, he canceled a scheduled hernia surgery at the VA, claiming he wanted to get a second opinion.[4] His motion included what purported to be a note from his doctor, who said Mr. Moore should do a minimum of walking and no prolonged standing. The note had no other restrictions. X-rays showed only mild degenerative changes in Mr. Moore's left knee. [Dkt. #176, p. 6].[5]

---

[3] Mr. Moore never disputed the eyewitness testimony of the two witnesses who observed him actively picketing on February 4.

[4] *See* Second Declaration of Dr. Anthony Harris. [Dkt. #204 at 2, ¶8]. That surgery never occurred.

[5] Mr. Moore claimed that he was in excruciating pain because "it was bone on bone."

Attached to the motion were photocopies of a patient medication information sheet provided by the VA on January 21, 2014 to Mr. Moore. There were prescriptions for Cyclobenzaprine, Diazepam, and Hydrocodone. Cyclobenzaprine is a muscle relaxant to be taken at bedtime. Neither the Diazepam nor the Hydrocodone prescriptions were refillable and there was only enough for five days. [Dkt. #176].[6]

Mr. Moore was repeatedly unreachable by phone, which he later explained was due to the fact that he turns off his phone when he is typing. [Dkt. #178] – thus showing Mr. Moore's capacity to at least type the required response to the motion for summary judgment. In fact, Mr. Moore had a computer at his home. *See infra* at 19.

On March 28th I scheduled a hearing for April 1st to determine how long, if at all, this now four-year-old case should be delayed. Mr. Moore was ordered to appear. [Dkt. #177]. Mr. Moore refused to attend the hearing because he said he was in the process of contacting his doctor to make an appointment. for April 1st. [Dkt. #178]. I continued the hearing on his motion to April 3rd. [Dkt. # 178]. Mr. Moore claimed he was unable to walk and was on crutches. He said he would contact the court by email; he was advised that this was inappropriate – he could not engage in *ex parte* communications and had to file a motion. [Dkt. #178]. True to his word, but oblivious to the court's directions, Mr. Moore sent an email on that same day. He claimed – contrary to the records he submitted – that his doctor ordered him not to walk or stand, and that he would not be attending the hearing because he had scheduled an MRI for that day. [Dkt. #182].

---

[6] At one point, the court was under the impression that the redactions Mr. Moore had made on the prescriptions were to the number of refills and the expiration dates of the prescriptions. That was clearly a mistake on the court's part and it plays no role at all in the decision of this case.

On April 1st, I ordered the defendant to file a written response to Mr. Moore's motion to continue the case for six months. [Dkt. # 181]. They did so on April 4, pointing out that the medications prescribed in January for his back were prescribed without refills or were to be taken only at bedtime (other than Ibuprofen) and that he was discharged from the emergency room on December 4, 2013 with an instruction of "observe" and a follow up as indicated as "See Gen Surg 1m for eval." [Dkt. #183]. Mr. Moore would later concede that his back situation did not prevent him from responding to the motion for summary judgment. [Dkt. #199].

Mr. Moore appeared by phone at the rescheduled hearing on April 7th. He said he would be seeing an orthopaedic surgeon and would likely have surgery. I told him that the records he had submitted so far did not appear to support his claim that it was impossible for him to respond to Local 597's motion for summary judgment. He was given another extension for his response to April 24th. [Dkt. ## 185-186]. Mr. Moore now claimed contrary to earlier assertions he was not seeing doctors at the VA. [Dkt. #185]. Mr. Moore was again advised of the consequences of failing to prosecute his case. *Id.*

On April 7th the Union filed a supplemental response to the plaintiff's motion to withdraw due to medical issues. [Dkt. # 187]. The Union retained the services of Dr. Anthony N. Harris, a board-certified Occupational Medicine physician to review the records submitted by Mr. Moore.[7] Dr. Harris concluded that Mr. Moore was under no medical restrictions that prevented him from performing a sedentary level of work, i.e. reading, writing, typing, sitting, or speaking on the

---

[7] Dr. Harris is the Assistant Medical Director of Community Occupational Medicine, LLC His duties include preparing disability analysis reports to assess the physical abilities of individuals in light of their medical and work needs. He is trained in the medical specialty of assessing people's injuries in conjunction with an assessment of what the resulting physical limitations will be. [Dkt. #187].

telephone. [Dkt. #187, Ex 3]. On April 9th, Mr. Moore was given 14 days to respond to this filing. [Dkt. #188].

Both before and after April 9th, Mr. Moore sent several emails to the court claiming to have attached medical records, but none were attached. [Dkt. # # 186, 193]. When he was told the next hearing date was set for April 21st, he said he could not call in that day due to a doctor's appointment. He refused to select another day where he could call in, vaguely claiming he had several doctors' appointments. Finally, he agreed to appear by phone on the originally scheduled date, April 21st. [Dkt. # 192]. The only additional medical evidence he ended up submitting showed that he might be scheduled for arthroscopic knee surgery and subsequent rehabilitation at some unknown time in the future.

On April 14th, Mr. Moore was again advised that his motion to stay had not been granted and that his response to the motion for summary judgment was due on April 24th. Mr. Moore again claimed that he was on psychotropic drugs and in desperate need of immediate surgery and not able to participate at all in the case. As in every other hearing with Mr. Moore, he was lucid, clear-speaking, and able to forcefully present his case. [Dkt. #192].

He was given another extension to file his response, to May 5th. [Dkt. #193]. On April 21st, in a conference call with counsel for defendant and the court, Mr. Moore conceded that whatever his back issues, they had nothing to do with his inability to pursue his case. [Dkt. # 199].

On April 28th, Dr. Harris submitted a detailed, supplemental declaration in which he reconfirmed his opinions in his declaration of April 4, 2014 and expanded on those opinions based upon his review of additional medical records. [Dkt. ## 187, 200]. In essence, he concluded that there was no medical support for Mr. Moore's claims that he was unable to pursue the case and that

there were no medical restrictions that would prevent him from proceeding in the case. Finally, Dr. Harris's examination of the unredacted prescription records that Mr. Moore had provided to the court led him to conclude that Mr. Moore had had only a five-day supply of medication "that could impair or alter his sensorium during that period of time in which the medication was taken and that assuming that the January prescriptions were taken as indicated, there is no documentation of a current prescription for any medication which may impair Mr. Moore [sic] cognitive level of functioning." [Dkt. #200, ¶16].[8]

The May 5th deadline for filing a response to the motion for summary judgment came and went with no response from Mr. Moore. On May 16th, a status conference was held. Mr. Moore had not filed his response to the motion for summary judgment which was then due on May 5th. Defense counsel represented that she had spoken to Mr. Moore who told her that he did not have the surgery he represented he was required to have on May 6th. [Dkt. #202].

On May 28th, Local 597 filed a Second Supplemental Declaration of Dr. Harris. [Dkt. #204]. This was, in actuality, Dr. Harris's third opinion in the case regarding Mr. Moore's physical impairments. Attached to Dr. Harris's submission were the medical records produced by the Hines VA Hospital.[9]  His review of the records led him to confirm his earlier opinions that there was no

---

[8] Dr. Harris went on to explain the limited period of time in which the medications Mr. Moore had been prescribed months earlier have operative effects. He concluded that there is "insufficient evidence in the documentation provided to support Mr. Moore being currently under the influence of prescribed medication with the potential to impair his sensorium and cognitive functional ability." *See id.*

[9] Other doctors Mr. Moore said he was seeing failed to comply with narrowly drawn subpoenas limited to records pertaining to the medical issues that Mr. Moore contended were precluding him from responding to the motion for summary judgment. While Mr. Moore would later claim that the doctors never received the subpoenas [Dkt. #209] – a contention disputed by the Union's counsel – the fact remains that Mr. Moore never procured affidavits or declarations from them supporting his claimed incapacity to participate in the case.

objective evidence to support physical limitations or impairments that would have adversely impacted Mr. Moore ability to read, write, type, speak, or perform other similar skills. *Id*. at ¶7.

He evaluated the prescriptions given to Mr. Moore and concluded that provided the listed medications were taken as prescribed, there is insufficient evidence in the documentation provided to support a conclusion that Mr. Moore had a cognitive impairment regarding his ability to read, write, type and speak. *Id.* at ¶ 8.  Dr. Harris concluded that Mr. Moore does not have an impairment in his ability to use his hands or arms as would be required for typing or writing. *Id.* at 9. Mr. Moore was given 14 days to respond to the medical filings. [Dkt. #203].

On May 29th, Mr. Moore appeared by phone and reported that he had arthroscopic surgery on his knee on May 20th. [Dkt. #205].  Mr. Moore was again given leave to file a response to any pending filings by defendant regarding his medical situation without regard to whether the time to file such a response had passed. [Dkt. #205].

Mr. Moore's response to Dr. Harris's prior declarations was filed on June 11, 2014, which corresponded with a June 11th hearing at which Mr. Moore personally appeared with a cane. [Dkt. #208]. Mr. Moore does not dispute Dr. Davis's opinions. Indeed, he has said "I have no response to Dr. Davis at all regarding my health." [Dkt. #210]. All he has said is that he is "not well and cannot bear weight on [his] knee yet." He has a prescription for hydrocodone and is receiving physical therapy following his knee operation on May 20th. [Dkt. #210].

On June 16, 2014, Dr. Harris filed a Third Supplemental Declaration in which he addressed additional medical records submitted by Mr. Moore on June 11th. Dr. Harris reviewed the prescription for eight weeks of physical therapy, a referral for a psychological evaluation and a June 3rd prescription for hydrocodone 10mg. – acetaminophen 325mg. He noted that the records

prescribed physical limitations of "weight bearing as tolerated." As to the hydrocodone prescription, he noted that there is no indication in the records that Mr. Moore has been prescribed that drug between his 5-day prescription issue on January 14th and the recent prescription of June 3rd. He noted that patients who are prescribed narcotic medications are generally restricted from performing work activities that are considered "safety sensitive." Patients are regularly permitted to take prescribed narcotic medication while performing non-safety sensitive, sedentary work duties such as secretarial, clerical or administrative work. Dr. Harris concluded that it continues to be his professional opinion that Mr. Moore does not have any limitations or restrictions which would impact his ability to type or write. [Dkt. #211]. It bears repeating that Mr. Moore has not procured affidavits or declarations – or even an unsworn note – from any of his many physicians supporting his claimed incapacity to participate in this case.

In sum, Mr. Moore had three months before his arthroscopic knee surgery on May 20th to file his response to the motion for summary judgment. [Dkt. #176]. He did not do so. And now, a month after the surgery, Mr. Moore still refuses to give any estimate of when he will file his response. [Dkt. # 209]. He has, in short, granted himself an indefinite stay. In doing so, he has made it impossible for the court to be able to manage its docket "so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630–31 (1962).

In this Circuit, deadlines count. "When parties wait until the last minute to comply with a deadline, they are playing with fire." *Spears v. City of Indianapolis*, 74 F.3d 153, 157 (7th Cir. 1996). "Time limits coordinate and expedite a complex process; they pervade the legal system.... 'Lawyers *and litigants* who decide that they will play by rules of their own invention will find that the game cannot be won.'" *United States v. Golden Elevator, Inc.,* 27 F.3d 301, 302 (7th Cir. 1994)(Emphasis

supplied).  Here, Mr. Moore did not wait until the last minute. Under his timetable there is no last minute. *Pro se* litigants do not have the right or the power to do what Mr. Moore has done. *Wehrs v. Wells,* 688 F.3d 886, 891-892 (7th Cir.2012)("although *pro se* litigants benefit from various procedural protections, they are 'not entitled to a general dispensation from the rules of procedure or court imposed deadlines.'"); *Fischer v. Cingular Wireless, LLC,* 446 F.3d 663, 666 (7th Cir.2006)( affirming dismissal where, among other things, *pro se* plaintiff was warned by defendants' motion that case could be dismissed if plaintiff continued to ignore discovery deadlines); *In re Cabot,* 537 Fed.Appx. 891, 894 (11th Cir. 2013)("Though pleadings filed by pro se litigants are construed liberally, '[l]iberal construction does not mean liberal deadlines.'").

Mr. Moore has made a number of damning allegations about his union, but "[n]othing is simpler than to make an unsubstantiated allegation." *Parko v. Shell Oil,* 739 F.3d 1083, 1086 (7th Cir. 2014).  The Union's summary judgment motion  meant it was time for Mr. Moore to back those allegations up with evidence. It was "put up or shut up time." *Diadenko v. Folino*, 741 F.3d 751, 758 (7th Cir. 2013).  *See also Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir.2008).

Looking at the evidence the Union submitted with its motion, it is perhaps no coincidence that, once this time came, Mr. Moore developed back and knee problems that were  purportedly so debilitating he was unable to come to court, participate by phone, or complete a summary judgment response in a span of four months.  But, "[o]nce a party invokes the judicial system by filing a lawsuit, [he] must abide by the rules of the court; a party cannot decide for itself when [he] feels like pressing [his] action and when [he] feels like taking a break because trial judges have a responsibility to litigants to keep their court calendars as current as humanly possible." *James v. McDonald's Corp*., 417 F.3d 672, 681 (7th Cir. 2005)(quotations omitted).

By all rights, this case could have been a candidate for failure to prosecute under Fed.R.Civ.P. 41(b).  While the case will not be dismissed as a sanction, it will be decided on the merits, based on the evidence the Union has presented.  Mr. Moore has effectively chosen to have that be the record in the case.

## A.

## Summary Judgment Principles

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir.2014) (quoting Fed.R.Civ.P. 56(a)). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that no genuine dispute exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.' " *Anderson*, 477 U.S. at 255 (citation omitted).

## B.

## Local Rule 56.1

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions.  In this case, that means they will be drawn from Local 597's submissions, because Mr. Moore hasn't filed anything.

 "For litigants appearing in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment." *Sojka*

*v. Bovis Lend Lease, Inc*., 686 F.3d 394, 398 (7th Cir. 2012). The party opposing summary judgment must respond to the movant's statement of proposed material facts, and that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Sojka*, 686 F.3d at 398; *Ciomber v. Cooperative Plus, Inc*., 527 F.3d 635, 643 (7th Cir. 2008). Each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc*., 559 F.3d 625, 632 (7th Cir. 2009); *F.T.C. v. Bay Area Business Council, Inc*., 423 F.3d 627, 633 (7th Cir. 2005).

The district court is entitled to expect strict compliance with the rule *Shaffer v. American Medical Ass'n*, 662 F.3d 439, 442 (7th Cir. 2011); *Benuzzi v. Board of Educ. of City of Chicago*, 647 F.3d 652, 654 (7th Cir. 2011) – even from *pro se* litigants like Mr. Moore. *See, e.g., McNeil v. United States*, 508 U.S. 106, 113 (1993)("... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). These expectations could not have been made any clearer to Mr. Moore in this case, as Local 597 – as required by Local Rule 56.2 – served and filed a notice detailing the rule's requirements. Nevertheless, Mr. Moore has failed to respond to Local 597's Local Rule 56.1 submissions, despite having had three months to do so. Accordingly, all the properly supported material facts set forth in Local 597's submissions will be deemed admitted. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013); *Perez v. Thorntons, Inc*., 731 F.3d 699, 712 (7th Cir. 2013); *Coleman v. Goodwill Industries of Southeastern Wisconsin, Inc*., 423 Fed.Appx. 642, 643 (7th Cir. 2011).

## C.

### The Material Facts Of The Case

Local 597 had a hiring hall in place from 1994 until January 1, 2006, which was made part of the area-wide agreement with the Mechanical Contractors Association. (*Defendant's Local Rule 56.1(a)(3) Statement* ("*Def.St.*"), ¶ 2). Under the Hiring Hall system, an out of work list ("OWL") of Local 597 members was maintained from which members would be referred to contractors in the order in which they appeared on the list, with those being out of work the longest appearing at the top of the list. (*Def.St.*, ¶ 3). To get on the OWL, members completed a personal profile registration form, identifying their skills, certifications, type of work they would accept, geographical preferences or restrictions, and contact information. (*Def.St.*, ¶ 4). If a pipefitter had been referred to a job from the OWL that lasted less than eleven days, under the hiring hall rules, they would lose their place on the list but would return to the same spot they held immediately prior to the referral. (*Def.St.*, ¶ 22).

It was the contractors, however, that had the sole and exclusive responsibility for hiring, firing, and accepting or rejecting pipefitters referred to them from the Hiring Hall. (*Def.St.*, ¶ 5). Contractors would request personnel by filling out a referral request form specifying the job available, and whatever criteria the Contractor needed: experience, training, skills, or other qualifications. (*Def.St.*, ¶ 6). The employer referral requests would be entered into the computer in the order received, and the computer would the highest pipefitter on the OWL whose profile matched the qualifications necessary to fill the request. (*Def.St.*, ¶ 7). Once the computer identified a pipefitter from the OWL, the hiring hall would call the pipefitter at the number on file and, if no response, would call the next pipefitter on the list. (*Def.St.*, ¶ 8).

Certain factors could take an out-of-work pipefitter off the list. If a pipefitter was unreachable on three or more occasions, he was placed on hold and was not eligible to receive referrals until he updated his contact information. (*Def.St.*, ¶ 9). Of course, a member also had to be current in paying his dues. (*Def.St.*, ¶ 13). A failure to pay dues would initially result in the pipefitter being placed on "hold" and, ultimately, being removed from the list entirely if the delinquency was not cured. (*Def.St.*, ¶ 14).

The hiring hall rules had exceptions for certain direct hires by contractors without regard to a pipefitter's position on the OWL, including: (1) a "recall" – the direct hire of a pipefitter who had worked for the contractor within the past year; (2) an "emergency hire" – the direct hire of a pipefitter for an emergency job as defined in the rules, with the contractor determining whether their situation qualified under those rules and (3) a "supervisor" hire, the direct hire of a pipefitter for a supervisory position. (*Def.St.*, ¶ 16, 21). Local 597 did not control who the contractors requested for direct hire under any exception. (*Def.St.*, ¶ 17). A superintendent, foreman, or other agent or employee of the contractor was responsible for recalling Local 597 members for a contractor under the hiring hall exceptions. (*Def.St.*, ¶ 18). This is how Mr. Moore explained it at his deposition:

Q: Okay. And the [business agents] get the list from the owner who is requesting certain names?

A: Yes.

Q: And it's the [business] owner who is requesting those names?

A: Yes.

Q: Okay.

A: And it's the superintendent.

Q: Who is requesting –

A: The 59 – no, no.  Listen to me.  Listen.  Can you hear me?  The 597 superintendent, my own union member now, is the person that has to either okay this or say, hey, wait a minute, this is wrong.

Q: The superintendent is employed by the contractor –

A: Yes.

Q: – correct?

A: Yes.

Q: Okay.  And the superintendent who is okaying or hiring or not hiring –

A: Yes.

Q: – is doing so on behalf of the contractor?

A: At the behest of the contractor, yes.

(*Defendant's Ex. 3*, Moore Dep., at 56-57).  So, Mr. Moore agrees that it wasn't Local 597 that was adversely affecting his employment prospects, it was the contractors.  The only connection to the Local was the fact that the contractors were working through one of his Union brethren.  Essentially, Mr. Moore thought his brothers with jobs should be looking out for him, rather than acting at the behest of their employers.  (Moore Dep., at 57).  But, of course, that's not up to Local 597.

Any disputes concerning the operation of the hiring hall were to be filed in writing with Local 597 within seven days of an alleged violation, which would trigger an investigation by Local 597 and possibly referral of the matter to a hiring hall committee.  (*Def.St.*, ¶ 24).  The hiring hall rules prohibited any discrimination against a member on the basis of race, color, national origin, religion or gender.  (*Def.St.*, ¶ 25).

Local 597 did away with the hiring hall system on January 1, 2006, and instituted a referral

hall system. Pursuant to the area-wide agreement, the new system requires 25% of all contractor hires in a quarter to be made through the referral hall from the OWL. (*Def.St.*, ¶ 26). The remaining 75% of hires by contractors in a quarter can be made directly by the contractor, without use of the referral hall. (*Def.St.*, ¶ 27). Referral hall rules do not permit any "direct hire" or "exception" hires with respect to the 25% of contractor hires which must be made through this system. (*Def.St.*, ¶ 32). Contractors that fail to comply with the 25% referral hall hiring requirement are subject to a range of penalties, including a written warning for first-time violators, and probation and monetary fines for subsequent violations. (*Def.St.*, ¶ 33). The OWL is maintained as before, and rules regarding dues and procedures for requests from the OWL were the same. (*Def.St.*, ¶¶ 28-31).

Also, as before, the contractor has the sole and exclusive responsibility for hiring, firing pipefitters referred to the contractor. (*Def.St.*, ¶ 34). A job referral from the OWL does not necessarily mean the pipefitter is automatically hired for the job; a pipefitter may have to pass a weld test, a drug test, a background check or other requirement before the pipefitter is hired by the contractor, or they could simply be rejected by the contractor. (*Def.St.*, ¶ 37).

According to Mr. Moore's own deposition testimony, there are any number of reasons he might have been passed up for a job referral that had nothing to do with his race. As already noted, certain jobs require skill sets or training. Pipefitters could be certified in various skills, like Medical gas, refrigeration, service filter, high work training, or scaffolding training. (*Def.St.*, ¶ 49; *Ex. 3*, Moore Dep., at 66). Mr. Moore said there were a "plethora" of such certifications, but he had only one: welding. (*Def.St.*, ¶¶ 49-50; Ex. 3, Moore Dep., at 66, 68, 185-190). Mr. Moore seemed to resent having to achieve a certification for these various skills:

I'm sorry, with the blueprint reading and the drafting, but, unfortunately, I have a CAD program at home so I don't need to go and learn that. A lot of this stuff I've done it for so many years and have learned it on some of the other jobs I've had to go to mitigate my circumstances to where I don't really need to go to 597 to learn it. I've learned some things 597 doesn't teach.

(Moore Dep., at 68). So there were job referrals he simply was not qualified for and there were job referrals that he turned down based on his own skill set. (*Def.St.*, ¶ 57, *Ex. 3*, Moore Dep., at 187-188, 199).

Mr. Moore also passed on jobs – and was passed over for jobs – that were out of the geographic area he preferred to work in. (*Def.St.*, ¶¶ 52-53, *Ex. 3*, Moore Dep., at 195-196, 200-201). Mr. Moore explained that, his current information on the OWL indicated he would not work outside Chicago, the western suburbs, or the northern suburbs. (Moore Dep., at 200-2001). At other times, he restricted himself to Chicago or refused to take jobs in Indiana; it varied. (Moore Dep., at 195-197).

There have also been times that Mr. Moore was placed on "hold" because he was not up to date paying his dues. (*Def.St.*, ¶ 55). At first, Mr. Moore testified that he was late with his dues "[j]ust once" since 2003. (Moore Dep., at 211). But, when confronted with a number of late dues notices, he had to concede that he was not current far more often than that, and more often than even the number of notices reflected. (Moore Dep., at 215). Mr. Moore paid no dues from December 2006 through March 2008. (Moore Dep., at 215). He also had late dues suspensions in January 2005, April 2005, July 2005, October 2005, and November 2005. (Moore Dep., at 220). He was also late in 2009 and possibly 2010 and 2011 as well. (Moore Dep., at 228). That meant there were a number of periods that Mr. Moore was not eligible to receive referrals, and the job would go to the next person on the list. Mr. Moore was unaware of any non-African-American pipefitters who

were kept eligible even though they had not paid their dues.  (*Def.St.*, ¶ 56; Moore Dep., at 228).

Beyond that, Mr. Moore allowed that there may have been times he lost out on referrals because he missed a call or – as appears to be his wont given his conduct in this case – had his cell phone turned off.  (*Def.St.*, ¶ 62; Moore Dep., at 72, 75).  In fact, he testified that his phone could "sit in [his] drawer in the dresser for some days, weeks, months, that [he] do[es]n't even turn it on," (Moore Dep., at 72), even though the only reason he had that cell phone was for Local 597 referrals. *Id*.

Beyond that, Mr. Moore also likely missed out on job referrals after failing drugs tests. (*Def.St.*, ¶¶ 59-60).  His records indicate he failed tests in April 2012, and failed to comply with a test in April 2002.  (*Def.St.*, Ex. 14).  A number of contractors, after having experience with Mr. Moore, have refused to rehire him.  (*Def.St.*, ¶ 61, Ex. 11).[10]

Mr. Moore has no support for his allegations against Local 597.  (*Def.St.*, ¶¶ 63, 67).  When asked why he thought he had been excluded from recall hires or direct hires due to his race, he all but chanted, "Because 597 is a racist organization.  597 is racist. . . . 597 is a racist organization. . . . It's just that simple." (Moore Dep., at 20).  When asked if he had any support for that, however, he said, "I have none." (Moore Dep., at 20).  He also had no evidence of any actions Local 597 has taken against him due to his race under referral hall system.  (*Def.St.*, ¶ 64; Moore Dep., at 45-46). Certainly, reciting the mantra, "racist" over and over is not evidence.

Mr. Moore cannot identify a single non-African-American pipefitter who was treated more favorably than he.  (*Def.St.*, ¶ 68).  For Mr. Moore, every pipefitter hired under the recall exception

---

[10] Mr. Moore also said that he had failed welding tests before – which also would have put him out of the running for a job – but he didn't think that had happened during the period at issue.  (Moore Dep., at 143-144).

was treated more favorably than he. He thought "the amount of people that were named recall versus African-American, it's a large number. It's egregious." (Moore Dep., at 39).[11] But he had to admit that he has no support for this assessment. And he has no evidence to show that the pipefitters who were hired under the recall exception were not eligible for that type of hire – that they had not worked for the contractor recalling them in the previous year. (Moore Dep., at 39-40).

Mr. Moore was able to identify only one job – a job for Exxon Mobile in 2003 – where he was allegedly not hired because of his race. (*Def. St.*, ¶ 71, Moore Dep., at 42). The job was a recall, hire, meaning the company was requesting pipefitters who had worked for it in the previous year. (Moore Dep., at 42). Thirteen pipefitters were requested but Mr. Moore was not one of them. (Moore Dep., at 42). When asked whether the thirteen were not qualified for the job under the recall exception, Mr. Moore responded, "No, I do not. I do not know, no." (Moore Dep., at 42). Mr. Moore had no evidence that there were any African American pipefitters on the OWL who would have been eligible for the job under the hiring hall exceptions. (*Def. St.*, ¶ 73). As of July 31, 2012, over two years into his case, he "ha[d]n't gotten that far into [his] investigation." (Moore Dep., at 134). Mr. Moore also cannot identify any non-African-American pipefitter who was lower on the OWL than he but placed ahead of him and referred for a job. (*Def.St.*, ¶ 74).

Mr. Moore also called into question a recall hire at some point in time from Fermi Labs. Again, he was not recalled, and the only reason Mr. Moore could fathom was racism:

> Even a professor who looks at things on a molecular level would go so far as to require this guy, that guy, and this guy, obviously scooting black men out of this.

---

[11] Mr. Moore was perhaps unaware that African-American pipefitters accounted for just 3% of the Union membership. [Dkt. # 169-3, at 11]. So even if both groups were recalled at exactly their rates of membership – or African-American pipefitters were recalled at twice or thrice their rate, for that matter – the difference would be "a large number."

> Why would a professor do this?  I don't think I can say it, but I'm going to say it.  A racist professor.

(Moore Dep., at 46).  Again, however, it was the contractor, Fermi Labs, making the recall request, not Local 597.  (Moore Dep., at 46).  Also along these lines, Mr. Moore testified regarding one occasion where he thought a contractor laid him off simply because he is African-American:

> And being laid off for little or nothing.  Being ran off, the one black man on the job. I hate to say it, but I got to say it since I was the only black guy on the job.  But one black man layoff here just the other day, 597 is orchestrating that as far as I'm concerned.

(Moore Dep., at 125).  But, again, Mr. Moore had to concede that he had no proof that Local 597 ever orchestrated anything.  (*Def.St.*, ¶ 69; Moore Dep., at 125).

As Mr. Moore's lack of any evidence to support any of his allegations is a recurring theme, it ought to be noted that Mr. Moore has not been acting *pro se* the entire time.  Mr. Moore filed his lawsuit on November 16, 2010.  Fact discovery closed on October 31, 2013. [Dkt. # 154].  During the three years in which discovery was ongoing, Mr. Moore had the benefit of representation for over half the time – 20 months.  He began by proceeding *pro se* [Dkt. #3], but secured the services of two attorneys on September 15, 2011. [Dkt. #40, 41].  Mr. Moore said he was unable to pay the retainer for those attorneys and they withdrew May 21, 2012. [Dkt. #76, 82].  Five new lawyers entered the fray on Mr. Moore's behalf on October 16, 2012. [Dkt. ##113-118].

Mr. Moore fired them in October of 2013. [Dkt. # 159].  Even assuming that Mr. Moore was incapable of requesting any discovery when he was *pro se*, the 20 months during which he was represented – first by two and then by five attorneys – provided ample time to uncover some shred of evidence to support his allegations – if there was any.

## II.
## ANALYSIS

### A.
### The Disparate Impact Claim[12]

To make out a disparate impact claim, a plaintiff must establish that a particular employment practice causes a disparate impact on a member of a protected class. 42 U.S.C. § 2000e–2(k); *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012); *Adams v. City of Chicago*, 469 F.3d 609, 613 (7th Cir. 2006). To satisfy this burden, the plaintiff is "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994(1988); *Puffer*, 675 F.3d at 717. This is not a trivial burden. *Meacham v. Knolls Atomic Power Laboratory*, 554 U.S. 84, 101 (2008). "[I]t is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005); *United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1264 -1265 (7th Cir. 1990). Failure to identify the specific practice could lead to employers being held liable for "the myriad of innocent causes that may lead to statistical imbalances." *Watson*, 487 U.S. at 994.

The plaintiff must also establish causation by "offer[ing] statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson*, at 994–95. Only if the plaintiff succeeds in establishing disparate impact does the burden shift to the defendant-employer to demonstrate that the employment practice is "job related for the position in question and

---

[12] It bears repeating that the claims at issue are set forth not in a *pro se* pleading but in the Fourth Amended Complaint filed by the five lawyers then representing Mr. Moore before he fired them a year later.

consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A); *see also Lewis*, 130 S.Ct. at 2198–99.  If the employer satisfies this requirement, the burden shifts back to the plaintiff to show that an equally valid and less discriminatory practice was available that the employer refused to use.  *Adams*, 469 F.3d at 613; *Puffer*, 675 F.3d at 717.

Local 597 argues that Mr. Moore has failed on both counts.  First, it points out that all Mr. Moore has done in the way of identifying the particular employment practice he is challenging is to allege that "the rules of the Hiring Hall are suspect at best", that "the disparate impact on [him] and other Afro-American journeymen is profound", and that "the current CBA (75%/25%) is the telefitter system renamed."[13] [Dkt. # 122, ¶¶ 12-13].  As such, Local 597 argues that Mr. Moore has simply identified a generalized policy and that is insufficient.

It is true that the case law requires a plaintiff to do more than point to a "generalized policy." *See Smith*, 544 U.S. at 241; *Puffer*, 675 F.3d at 717.  Merely stating the hiring hall and/or referral hall systems result in a disparate impact is not isolating and identifying a specific practice.  *See Watson*, 487 U.S. at 994.   Mr. Moore had to "identif[y a] specific test, requirement, or practice within the [system] that ha[d] an adverse impact on [African American] workers." *City of Jackson*, 544 U.S. at 241; *Meacham*, 554 U.S. at 101.  He has not done so.

What is more, his failure to respond to Local 597's motion for summary judgment means that he is standing on nothing more than the allegations of his Fourth Amended Complaint.  That's not

---

[13] The "telefitter" system was the discriminatory practice by which Local Union 597 had circumvented the hiring hall system that was in place at the time of *Daniels v. Pipefitters' Ass'n Local Union 597*, 945 F.2d 906 (7th Cir. 1991); http://articles.chicagotribune.com/1993-07-19/news/9307190086_1_union-members-word-of-mouth-jobs.

sufficient either. *See Black Landscapers,* 916 F.2d at 1264 ("the facts alleged in plaintiffs' complaint have little relevance at the summary judgment stage.").

But this decision need not rest on Mr. Moore's failure to identify a specific practice because he has not carried his burden of establishing causation either. The statistical evidence Local 597 presents shows that African American pipefitters on the OWL were referred for jobs at greater rate than would be expected based on their numbers. African American pipefitters accounted for 6.9% of the members on the OWL, but they accounted for 9.7% of the job referrals. (*Def.St.*, ¶ 47; Ex. 13, Dr. Evans' Expert Report, at ¶¶28-29). That means that African American pipefitters were referred for jobs 40% more often than might be expected given their numbers on the OWL. White pipefitters, on the other hand, were referred at a rate slightly less than might be expected from their numbers on the OWL. They made up 85.7% or the OWL, but only received 82.4 % of the job referrals. (*Def.St. Ex.*13 (Ex. 2,3)). The only portion of the hiring process in which Local 597 is involved – the job referrals – statistically does not have a disparate impact on African American pipefitters. This isn't even a case where there *is* a racial imbalance in the workforce. *Cf. Wards Cove,* 490 U.S. at 657 ("... a Title VII plaintiff does not make out a case of disparate impact simply by showing that, 'at the bottom line,' there is racial imbalance in the work force. As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack.").

Not responding to Local 597's motion, Mr. Moore, of course, has come forward with no evidence to support his disparate impact claim. Rather than leave it at that and win in a walkover, Local 597 has presented Mr. Moore's Rule 26 expert report. Mr. Moore tasked his expert, Dr. Rothman, with "examining the number of hours worked by pipefitters in Local 597 during the time

period 2004 through 2012 with the goal of examining the average hours worked by workers of various races." [Dkt. #169-2, at ¶ 2].

That's not a helpful analysis to have undertaken, at least not in this case. Mr. Moore doesn't allege anything regarding disparity in the number of hours worked. He alleges a disparity in the number of job referrals received. Specifically, he claims that "[f]rom May 4, 2002 to the present, [he] has sought *job* referrals from Local Union 597 and was not given referrals while other white members of the Union were referred to *jobs* . . . ." [Dkt. # 122, ¶¶ 17, 23, 27].

Most likely, Mr. Moore did not focus his allegations on the number of hours worked because it is undisputed that Local 597 has nothing to do with that. It's up to the individual contractors. (*Def.St.*, ¶ 39). Even Dr. Rothman conceded that "the actual hours assigned and paid for, . . . are determined by the person paying the bill. . . . The contractor." [Dkt. #169-1, Rothman Dep., at 38]. The number of hours would, presumably, depend on the type of job. [Dkt. #169-1, Rothman Dep., at 37]. And so the fact that white workers averaged 36% more hours than African American workers in 2004, 25% more in 2005, 20% more in 2006, 17% more in 2007, 11% more in 2008, 24% more in 2009, 24% more in 2010, 6% more in 2011, and 3% more in 2012 [Dkt. # 169-2, ¶ 8], is meaningless for the purposes of this case. If Local 597 was not responsible for the assignment of hours – and it was not – it cannot be liable for the alleged discrimination. *See EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 659, 661 (7th Cir.2003) ("The union is not the company, but the workers' agent in dealing with the company. If it discriminates in the performance of its agency function, it violates Title VII, but not otherwise. . . we reject the EEOC's contention that unions have an affirmative duty to prevent racial harassment or other forms of unlawful discrimination in the workplace.").

Dr. Rothman's report, then, does not "fit" the issue in this case. As such, it could properly be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Fed.R.Evid. 702. *See Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)("... the evidence or testimony [must] assist[] the trier of fact in understanding the evidence or in determining a fact in issue. In other words, 'the suggested scientific testimony must 'fit' the issue to which the expert is testifying.'").

But even if Local 597 were responsible for hours, and hours were the issue, it could also be excluded because Dr. Rothman did not perform the type of analysis the issue and the evidence demanded. He did no regression analysis. He did not account for any variables that might have affected the number of hours of African-American pipefitters worked.

Now, "[n]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). But a study can be so incomplete as to be inadmissible as irrelevant . . . ." *Id.* at 400 n. 10. Here there were a number of neutral variables that affected a pipefitter's placement on the list: payment of dues, areas or specialization, certifications, location preference, etc. Indeed, Mr, Moore had to admit that his own placement on the list was affected by any or all of these at one time or another. But Dr. Rothman ignored them all.

In the end, Dr. Rothman's report is not probative of disparate impact on job referrals to African American pipefitters and of doubtful admissibility under the best of interpretations. Nonetheless, we have factored in Dr. Rothman's analysis in the summary judgment determination. Local 597 is still entitled to summary judgment.

## B.

## The Disparate Treatment Claim

Mr. Moore also alleges disparate treatment under 1981 and Title VII. He brings Count I under §1981, and complains that he sought job referrals from May 4, 2002, to the present, and was not given referrals while White pipefitters were. [Dkt. #122, ¶17]. This, Mr. Moore claims, deprived him of the right to make and enforce employment contracts. [Dkt. #122, ¶19]. Local 597 begins its attack on this count by arguing that the applicable statute of limitation for such claims is two years. (Dkt. #171, at 9). There are two possible statutes of limitations for §1981 claims. If the claim arises under the Civil Rights Act of 1991, amendment, the federal, catch-all, four-year statute of limitations – 28 USC §1658 – applies. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). If it arises under the original version of §1981, the two-year statute of limitations borrowed from Illinois's personal injury law – 735 ILCS 5/13–202 – applies. 541 U.S. 369, 377-378; *Campbell v. Forest Preserve Dist. of Cook County, Ill.*, – F.3d –, –, 2014 WL 1924479, 2 (7th Cir. 2014).[14] Mr. Moore's claim is about making and enforcing contracts, so it arises under the original version of the statue, *Jones*, 541 U.S. at 383-384, meaning the two-year limitations period applies.

---

[14] The Seventh Circuit succinctly explained this little slice of esoterica in *Campbell*:

> Prior to 1990, Congress had not adopted a statute of limitations for federal claims. Thus, courts were instructed to borrow the most analogous state statutes of limitations, both for § 1983 claims against state actors, and for § 1981 claims against private actors. Later, the Supreme Court clarified that such claims were governed by the forum state's personal-injury statute of limitations. In Illinois, that statute of limitations is two years. 735 Ill. Comp. Stat. 5/13–202.

> On December 1, 1990, Congress adopted a four-year statute of limitations for federal claims. 28 U.S.C. § 1658. However, this applies only to civil actions "arising under an Act of Congress enacted after the date of the enactment of this section." Id. The Supreme Court has interpreted § 1658 to apply only "if the plaintiff's claim against the defendant was made possible by a post–1990 enactment," and to leave "in place the 'borrowed' limitations periods for pre-existing causes of action."

2014 WL 1924479, 2.

But it really doesn't matter. A §1981 plaintiff may prove discrimination by either the direct or indirect method of proof. Under the direct method of proof, the plaintiff makes a case by pointing to evidence directly showing that his employer subjected her to an adverse employment action on an impermissible discriminatory basis—here, on the basis of race. *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060–61 (7th Cir. 2003). Under the indirect method of proof, the plaintiff has the initial burden of establishing a *prima facie* case that, among other things, similarly situated union members employees outside of his protected class were treated more favorably by Local 597. *Andrews*, 743 F.3d at 234; *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir.2006).

Beginning four years before Mr. Moore's complaint or two years before Mr. Moore's complaint, Mr. Moore has no evidence – direct or indirect – to support his claims. He just has a sense or a feeling that he was left out of jobs due to racism, and that this was somehow the Union's doing. He has no evidence that he was treated any differently than any similarly situated White pipefitters. He has not even been able to come forward with any comparators. *See Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009)(plaintiff had to point to similarly situated individual who was directly comparable in all material respects); *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir.2005)("A similarly situated employee is one who is directly comparable to [the plaintiff] in all material respects."). He has nothing but his allegations and, on summary judgment, that is insufficient. *Anders v. Waste Management of Wisconsin*, 463 F.3d 670, 675 (7th Cir. 2006). Local 597 is clearly entitled to summary judgment on this claim.

For the same reasons, the Union is entitled to summary judgment on Mr. Moore's Title VII discrimination claim as well. Title VII and §1981 discrimination claims are typically analyzed under

the same rubric.  *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007); *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 337-38 (7th Cir.2002).  Again, Mr. Moore has no evidence that the Union discriminated against him in terms of job referrals, regardless of whether he is proceeding under the direct or indirect method.  And, as already explained, the Union is not responsible for whatever discrimination Mr. Moore thinks that contractors may have engaged in by not selecting him for jobs.  *E.E.O.C. v. Pipefitters Ass'n Local Union 597*,  334 F.3d 656, 661 (7th Cir. 2003).

## C.

### The Retaliation Claim

Mr. Moore alleges that, in retaliation for his having "filed and participated in previous litigation against the Union by other African American Union members" and having "consistently spoken out and protested against the Union's discriminatory practices", Local 597 further reduced job referrals to him.  (Dkt. # 122, ¶¶ 24-25).  His claim fails for essentially the same reasons his Title VII and §1981 claims do.  To survive summary judgment, Mr. Moore has to produce evidence from which a reasonable jury could find that Local 597 decided to deny him job referrals because of his litigation and protest activities.  *University of Texas Southwestern Medical Center v. Nassar,* 570 U.S. ——, ——, 133 S.Ct. 2517 (2013); *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013).

But, Mr. Moore has no direct evidence or "convincing mosaic" of evidence that the Union denied him any job referrals for any illegitimate reason. .  There is no suspicious timing; no ambiguous statements or behavior towards other African American pipefitters; no evidence that similarly situated employees outside of the protected group systematically receive better treatment;

no evidence that Local 597 offered a pretextual reason for Mr. Moore's lack of job referrals. *See Hobgood*, 731 F.3d at 644. He has no evidence that would satisfy the burden shifting method; no evidence regarding similarly situated White pipefitters who were treated better than he. *See Johnson v. General Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728-29 (7th Cir. 2013).

On summary judgment, Mr. Moore's suspicions are not enough to carry the day. *Sallis v. Aurora Health Care, Inc*., 381 Fed.Appx. 591, 592-593 (7th Cir. 2010). Local 597 is entitled to summary judgment on this claim as well.

### D.

### The Duty of Fair Representation

Local 597 argues it is entitled to summary judgment on Mr. Moore's breach of duty of fair representation claim either because it is barred by the applicable six-month statute of limitations or because it simply fails on the merits. Regarding the statute of limitations, the Union argues that Mr. Moore filed an EEOC charge regarding the breach of duty of fair representation in July 2004. As he did not add a breach of duty of fair representation claim until March of 2012, Local 597 contends it is time-barred.

Local 597 is not entitled to summary judgment on this basis. First of all, Local 597's argument is based on facts that were not included in their Local Rule 56. 1 statement. Just as we demand compliance with the Local Rules from Mr. Moore, so too is compliance required by the defendant. Second of all, as Local 597 points out, Mr. Moore's duty of fair representation claims involve the same conduct as his discrimination claims. That means they begin in May 2002 and

continue on through the present (Dkt. # 122, ¶¶ 17, 29), putting some acts within the six-month period.

As such, summary judgment cannot be granted on this basis because Local 597 has ignored the issue of whether the claims constitute a continuing violation. *See Lewis v. Local Union No. 100 of Laborers' Intern. Union of North America, AFL-CIO*, 750 F.2d 1368, 1378 (7th Cir. 1984)("In our view, the original complaint is timely because it alleges an ongoing course of conduct by the Union 'since February, 1980' of repeatedly refusing to refer [plaintiff] out for employment."); *see also Christiansen v. APV Crepaco, Inc.*, 178 F.3d 910, 915-16 (7th Cir. 1999); *Jointer v. Potter*, 116 Fed.Appx. 746, 748-749 (7th Cir. 2004). This is not to rule that the circumstances do constitute a continuing violation, but merely to say that summary judgment cannot be granted without any attention to the issue from Local 597.

Local 597's second argument fares better as, again, Mr. Moore has come forward with no evidence. In his complaint, he claimed Local 597 breached its duty of fair representation by failing to represent him by providing him with job referrals from employers. (Dkt. # 122, ¶¶ 31-32). At his deposition, he claimed the breach was a result of the contractor's superintendent acting at the behest of the contractor rather than looking out for his fellow Union member, Mr. Moore. (Moore Dep., at 237). Notably, Mr. Moore didn't file a grievance with the Union about either of these things (Def. St., ¶ 77; Moore Dep., at 244), despite the fact that Local 597 had a grievance procedure for disputes regarding the operation of the hiring hall and, later, the referral hall. (*Def.St.*, ¶ 78; Ex. 4, at 8-9; Ex. 7, at 5). Nevertheless, when Mr. Moore filed his EEOC charge in 2003, the Union treated it as a grievance and asked Mr. Moore to provide it with information so that the charge could be

investigated. (*Def.St.*, ¶ 78). Mr. Moore never responded to the request and Local 597 eventually dropped the matter. (*Def.St.*, ¶ 79).

"The duty of fair representation requires a union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. In other words, a union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998)(quotations omitted). A union's actions are considered arbitrary only if, in light of the factual and legal landscape at the time of the Union's actions, the Union's behavior is so far outside a "wide range of reasonableness" as to be irrational. *Air Line Pilots Ass'n, Intern. v. O'Neill*, 499 U.S. 65, 67 (1991). Mr. Moore offers no evidence that this was the case here.

Nor does he offer any evidence that the Union acted discriminatorily or in bad faith. He comes forward with nothing to show Local 597 acted with any animus, racial or otherwise, toward him regarding referrals for jobs. *Greenslade v. Chicago Sun-Times, Inc.*, 112 F.3d 853, 866-867 (7th Cir. 1997)(racial animus); *Conn v. GATX Terminals Corp.*, 18 F.3d 417, 420 (7th Cir. 1994)(personal animosity). There is no evidence that Local 597 operated its hiring or referral halls "without using consistently applied, objective criteria" or that it "exercise[d] its hiring authority in a[n] []arbitrary and []discriminatory fashion*." N.L.R.B. v. Teamsters General Local Union No. 200*, 723 F.3d 778, 784 (7th Cir. 2013). Mr. Moore offers no "subsidiary facts" that would support any claim of bad faith on Local 597's part. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 916 (7th Cir. 2013).

Moreover, Mr. Moore has not shown that the integrity of the grievance process was somehow subverted by the Union. *Thomas v. United Parcel Service, Inc.*, 890 F.2d 909, 915 (7th Cir. 1989).

Mr. Moore never even filed a grievance. Nevertheless, when Local 597 decided to treat his EEOC charge as a grievance, he refused to cooperate in its investigation. There was nothing more Local 597 could do at that point. In short, Mr. Moore has nothing to support his duty of fair representation claim. As with the rest of his claims, the Union is entitled to summary judgment on this one as well.

## CONCLUSION

There is no doubt that Mr. Moore truly feels wronged by his Union. And there is no doubt that he thinks racism pervades the activities of his Union. And given the history of Local 597, the Union is perhaps an understandable target of his suspicions. But charges of racism are easy to make. They are commonplace outside the courthouse. But inside the courthouse, "saying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact . . . ." *United States v. 5443 Suffield Terrace, Skokie, Ill*., 607 F.3d 504, 510-11 (7th Cir. 2010).

The statistics show that African-American pipefitters were referred to jobs from the OWL at a greater rate than their representation on that list. If Mr. Moore is looking for who sabotaged his employment prospects, his own testimony suggests he might start, not with his Union, but with himself. He has several stretches throughout the pertinent period where he didn't pay his dues. He would turn off his phone that he had for no other reason than to get job referrals for days, weeks, or even months at a time. He didn't think he needed to be certified in the various specialties that would open up certain referrals to him. He failed one drug test and did not comply with another. According to his own testimony, the list of his own deficiencies that might put him behind the pack in getting job referrals is rather long. The supposed evidence that the Union discriminated against him,

retaliated against him, or that the hiring and referral halls caused a disparate impact on African-American pipefitters retaliated against him is non-existent.

The defendant's motion for ruling on plaintiff's motion for summary judgment [Dkt. #206] is GRANTED as is defendant's Motion for Summary Judgment. [Dkt. # 171]. The defendant's motion to bar the expert report and testimony of Dr. Rothman [Dkt. # 168] is DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 6/20/14

**DEADLINE FOR THE FILING OF AN APPEAL FROM THIS ORDER**

Under Federal Rule of Appellate Procedure 4(a)(1)(A), a party in a civil case must file a notice of appeal within 30 days after entry of the judgment or order appealed from to preserve his right to appeal. *See Banks v. Chicago Bd. of Educ.,* 750 F.3d 663 (7th Cir. 2014).